IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| AUDREY WAITES, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 10-AR-1062-S |
| | } | |
| BIRMINGHAM BOARD OF | } | |
| EDUCATION, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

Before the court is the motion of defendant, the Birmingham Board of Education ("the Board"), for summary judgment as to all claims brought by plaintiff, Audrey Waites ("Waites").  Doc. 22. Waites, a former social studies teacher employed by the Board at West End High School in Birmingham, Alabama, brings claims for disability discrimination and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and Alabama Code (1975) § 21-7-8 (the "Alabama Disability Discrimination Statute").  For the reasons set forth below, the Board's motion for summary judgment will be granted in part and denied in part.

## FACTS[1]

Waites began teaching social studies at West End in the 1990s, and by 2006, she was the social studies department head.  In early

_____

[1] Because of the procedural posture, all facts are viewed in the light most favorable to Waites.

2006, Waites complained to her doctor of lightheadedness and becoming easily winded.  She was diagnosed with chronic obstructive pulmonary disease ("COPD"), congestive heart failure, and pulmonary hypertension.  She was hospitalized for three days, but she then returned to work.  In March 2006, Waites collapsed while at home. She was again hospitalized for three to five days, and this time she was ordered by her doctor to undergo outpatient rehabilitation for six weeks before she could return to work.  Waites says that she was, and still is, limited in her ability to walk, bend, and breathe.  On April 4, 2006, her doctor submitted correspondence to the Board, stating:

> This patient is followed by me for underlying pulmonary hypertension and sleep apnea.  She requires chronic oxygen for this condition on a continuous basis.  The patient expresses concerns about her ability to use the oxygen while in a classroom and she is requesting consideration for another job position.  I anticipate her continued need of the oxygen and do think such a request is reasonable. She continues regular follow up for her medical condition.

Waites has stated that she was concerned about using her oxygen tank in her classroom at West End because the oxygen provider had warned her that the tank should not be exposed to direct heat, and students had previously set fires in garbage cans and inside bathrooms located near her classroom.  If this constituted an insistence that the only possible accommodation was reassignment to a safer school, she retreated from any such position, and neither

party ever made any argument based on it.  Waites was also concerned that the tank's cord could come into contact with the open radiators located in all of the classrooms at West End.  Based on these concerns, Waites asked to be transferred to a different school without open radiators in the classrooms.  However, Waites also says that she was not eager to leave her department head position at West End and that the goal of her rehabilitation was always to return to the classroom.

Waites ultimately did not return to work for the remainder of the 2005-2006 school year at West End because she experienced a setback in May 2006.  On May 18, 2006, her doctor sent another letter to the Board, advising that Waites would remain under his care until September 2006, and stating: "She is currently requiring pulmonary rehabilitation three times weekly as well as continuous oxygen and she is currently unable to work."  During this time, Waites used her sick leave days and thus continued to be paid.

During the summer of 2006, Waites discussed her disabilities and her need for accommodations with Adrienne Mitchell ("Mitchell"), the Board's classified staffing director in human resources, whose job duties included working with individuals who needed accommodations for a disability.  According to Waites, Mitchell repeatedly tried to convince her to retire.  Mitchell denies encouraging Waites to retire, and says that Waites was never interested in retirement and instead wanted to return to teaching.

At Mitchell's request that Waites provide a written statement regarding her disabilities, Waites's rehabilitation nurse sent the Board a letter dated June 26, 2006, stating in part:

> [T]he following may be of benefit as you seek to plan Mrs. Waites's job duties. Mrs. Waites has difficulty walking and standing for an extended time frame. To assist with energy conservation, it would be beneficial to locate her classroom or working area in close proximity to all supplies needed, restroom, handicap parking arrangements, and an environment safe for oxygen use.

On August 4, 2006, Waites also sent a letter to Dr. Stan Mims, the Board's Superintendent ("Superintendent Mims"), advising him of her request for accommodations and expressing her concerns about the danger of returning to her current classroom with her oxygen tank.

On Monday, August 7, 2006, which was the first day of the 2006-2007 school year, Waites reported to work at West End, and provided a return to work slip signed by her doctor and dated August 4, 2006. Allen Lewis, Waites's principal and immediate supervisor ("Principal Lewis"), told her that because she had not been reinstated after her sick leave, that he was not expecting her at school, and that he had scheduled a substitute to teach Waites's class. Principal Lewis called Barbara Allen, the Board's Chief of Staff ("Chief of Staff Allen"), informing her that Waites was on campus and seeking advice on what to do under the circumstances. Chief of Staff Allen requested to speak to Waites on the phone, and informed her that she needed to leave the premises. Waites then

4

attempted to speak with Superintendent Mims, but he was not available. However, Waites was able to have a meeting that afternoon with a group composed of Chief of Staff Allen, Mitchell, and Eleanor Traylor, the Board's Assistant Superintendent ("Assistant Superintendent Traylor"), whose job duties included supervising schools in the West End area. During the meeting, Waites was advised that before she could be reinstated from her medical leave, she would need to provide statements from her doctors clearing her to return to work as well as some kind of certification demonstrating that her oxygen tank was safe to use in the classroom. Accommodations for Waites were also discussed. Mitchell placed Waites on paid administrative leave for two weeks (from August 7, 2006 to August 18, 2006) to give Waites time to obtain the safety certification and to allow the Board to get accommodations in place.

After the meeting, Waites wrote a letter to Mitchell, dated August 9, 2006, stating in part:

> Upon receipt of your letter on August 7, 2006 hand delivered to me in the presence of Mrs. Allen and Dr. E. Traylor is [sic] not directly what you and I, the below signed previously discussed. This letter is the first and only correspondence I've received from you regarding making accommodations for me at the workplace. During our telephone conversations you continually recommended disability and/or retirement to me to the degree whereby I felt annoyed, disturbed, and aggravated to the point of harassment. My belief of recovery led me to request accommodation for which you seem to have turned a blank ear. I am now

> pleased   you   have   chosen   to   consider
> accommodations as per my original request.

Also following the meeting, Waites's doctor sent a letter to the
Board, clearing her to return to work and explaining: "This patient
is followed by me for pulmonary hypertension, COPD [Chronic
Obstructive Pulmonary Disease], and sleep apnea. The patient
requires continuous oxygen."   Additionally, at Mitchell's
instruction, Principal Lewis put certain accommodations in place
for Waites.  He assigned her a classroom on the first floor near
the entrance to the school, a parking place near the entrance she
used, and a designated closet for storing oxygen tanks.  He made
Waites keys to the faculty restroom and lounge, he put up "Oxygen
in Use" signs in those areas, and he relieved Waites of hall,
lunch, and assembly duties.   He then informed the Board that
appropriate accommodations had been made.

Waites received a letter from Superintendent Mims, dated
September 19, 2006, rescinding her paid administrative leave and
instructing her to return to work effective Thursday, September 21.
2006.[2]  The letter stated: "We have checked with a local oxygen
provider regarding the oxygen safety issues that we previously
discussed with you and have been informed by the provider that the

---

[2] It is unclear why Waites did not receive this letter until
September 19, 2006, a month after the two-week administrative
leave time period was originally set to expire.

6

use of oxygen is relatively safe, barring exposure to open flame."[3]
However, the letter also instructed Waites to provide a written
statement from her oxygen provider regarding the safety of her
oxygen tank by Friday, September 22, 2006.  When Waites received
the letter, she called Principal Lewis, who confirmed that he had
also received word of her return.  Before she could return to work,
however, Chief of Staff Allen called Waites, informing her that
"there was something else she needed to clear up" before Waites
could return, and instructing her not to return to work and to
disregard Superintendent Mims' letter.[4]

While waiting for word about her reinstatement, Waites
suffered another medical setback in October 2006.  Her doctor sent
correspondence to the Board on October 26, 2006, indicating that
Waites would be under his care until January 2007.  Waites went
back on paid sick leave, but at some point in December 2006 or
January 2007, she had exhausted all of her sick days and had to
start using donated sick leave days from the Board's sick bank.
Waites also spoke with Chief of Staff Allen several times between

---

[3] Assistant Superintendent Traylor has stated that at some
point during this time frame, Ken Wasmund, a Board employee, also
checked with the Alabama State Department of Education, which
assured him that Waites's oxygen tank would not be a safety
issue.

[4] The Board apparently disputes that Chief of Staff Allen
told Waites not to return, because it instead contends that
Waites independently chose not to return to work on September 21,
2006.

October 2006 and January 2007 regarding her accommodations request. Waites says that Chief of Staff Allen informed her that a position at a newer school might be available, but later told her that the position was unavailable.  Waites also says that Allen avoided her questions about reinstatement, saying that she would have to get back to her regarding when she could return to work.

On January 16, 2007, Waites's doctor cleared her to return to work as of February 1, 2007.  Suspicious that the Board was not going to allow her to return, Waites contacted her union, the Birmingham division of the American Federation of Teachers ("ATF"). On January 22, 2007, Waites called a meeting with her ATF representative, Assistant Superintendent Traylor, Chief of Staff Allen, and Mitchell.  During the meeting, Waites was again informed that the Board needed her to produce a safety certification from the manufacturer of her oxygen machine that would sufficiently satisfy the Board that the machine was safe for use in the school. Waites's ATF representative explained during the meeting that all the oxygen manufacturer could produce was a users manual explaining how the machine operated.  Despite the apparent non-existence of any safety certification, Mitchell repeated that the Board needed a certification.  The fact that Waites had exhausted her sick days and was having to use donated sick days was also discussed.

Following the meeting, Waites's ATF representative sent Mitchell a letter dated January 29, 2007, again requesting tank at

West End.  The letter states in part:

> Mr. Watts at the Board of Education requested
> certification as to the safety of the
> equipment be provided by PSA.  I requested
> certification from the company but was
> informed that they did not have such
> certification.  The company did however
> indicate that this type of equipment had been
> safely installed in other schools and in
> public and private offices throughout the
> state.  PSA directed me to the Q and As
> located in the equipment manual (enclosed)
> these manuals explain the procedure for safe
> operation of the equipment.

In another letter to Mitchell dated February 9, 2007, Waites's ATF
representative stated: "As per our conversation earlier this week,
I've been trying to ascertain the status of Ms. Waites's request
for reasonable accommodations.  I hope this matter will be resolved
by now."  In a third, undated letter to Mitchell, he noted that it
had been approximately one month since a request was made for
reasonable accommodations.  Waites's ATF representative received no
written response from Mitchell to any of these letters, and Waites
never heard anything more from the Board regarding her
accommodations request or the possibility of a return to work.

By March 2007, Waites had used up all of the donated days from
the Board's sick leave bank.  This meant that she was no longer
getting paid.  On March 19, 2007, Waites made the decision to
retire so that she could receive her retirement income, and so that
she could stay in the insurance program that the state allocated
for retirees.  On April 4, 2007, Waites went to West End to provide

paperwork that had been requested as part of the retirement
process. According to Waites, Mitchell saw her in the hall, and
handed her a letter dated March 30, 2007.[5]  In the letter, Mitchell
claims that consistent with a conversation she and Waites had on
March 12, 2007, Waites was now authorized to use her oxygen tank at
school and come back to work. Waites denies that she ever had such
a conversation with Mitchell on March 12, 2007. During her
deposition, Mitchell could recall nothing that was said during this
March 12 conversation. She also testified that she did not know
what had changed between January and March 2007 to make it
acceptable for Waites to use her oxygen tank at school. According
to Waites, Mitchell already knew of her plans to retire when she
saw her in the hall on April 4 because had already announced it.[6]

Waites filed a charge of discrimination with the Equal
Employment Opportunity Commission ("EEOC") on June 15, 2007,
alleging discrimination based on age, sex, disability, and
retaliation.[7]  On September 30, 2008, the EEOC issued a letter of

---

[5] Mitchell disputes this, and instead contends that she
mailed the letter to Waites on March 30.

[6] Mitchell also disputes that she knew of Waites's intention
to retire during this time.

[7] Waites's EEOC charge states in part: "In March 2006, I
learned I had a disability and had to take leave until January
2007, at which time my doctor released me to return to work. I
notified my employer that I was ready to return and requested an
accommodation to assist me in the performance of my job. The
employer refused to grant me the accommodation. Had I been
accommodated in January 2007, I could have performed the duties

determination regarding the merits of Waites's charge, which
provides in part:

> Specifically, the evidence indicates that the
> Charging Party is a qualified individual with
> a disability. Evidence also indicates that
> the Charging Party could perform the essential
> functions of the job with an accommodation.
> Evidence indicates the Charging Party
> requested an accommodation. Respondent was
> aware of the request for a reasonable
> accommodation and could have reasonably
> accommodated the Charging Party's request.
> The evidence indicates that the Charging
> Party's request [sic] to return to her
> position were continuously denied because of
> Respondent's continued insistence upon
> certification of the required oxygen
> equipment. Respondent continued to force this
> requirement even after it was informed that no
> such certification existed or could be
> provided. Like and related out of the
> investigation, the evidence establishes that
> the Charging Party was constructively
> discharged inasmuch as she was forced to take
> retirement in order to maintain an income.

After receiving a right to sue letter, on April 23, 2010,
Waites filed this complaint against the Board, alleging that the
Board violated the ADA by failing to provide her reasonable
accommodations and retaliating against her in the form of
constructive discharge after she requested accommodations by
forcing her to go into retirement to maintain an income. The

---

of my job or several other positions with no problem had the
employer granted me the opportunity. . . . So on March 19, 2007,
I was forced to tender my paperwork for retirement because I
would not have an income. On April 4, 2007, after I presented
retirement papers, I was given a letter informing me that I was
being allowed to return to work."

complaint also alleges that the Board violated the Alabama Disability Discrimination Statute in taking such actions.[8]  After discovery, the Board filed a motion for summary judgment, doc. 22, to which Waites has responded, doc. 28, and the Board has replied, doc. 33.

## Discussion

As an initial matter, the Board argues that Waites's claims are barred because she did not timely file her EEOC charge.  This argument is without merit.[9]  Title VII requires an employee to file a charge of discrimination with the EEOC within 180 days "after the alleged unlawful employment practice occurred."  *See* 42 U.S.C. § 2000e-5(e)(1).  Because Waites filed her EEOC charge on June 15, 2007, any claims arising out of alleged discriminatory or retaliatory conduct occurring before December 17, 2006, would be time-barred.  However, the core of Waites's discrimination and retaliation claims arises from the Board's conduct during and after her doctor cleared her to return to work in January 2007.  More specifically, Waites's position is that in January 2007 and the months following, the Board failed to provide reasonable accommodations that would allow her to return to work by insisting that she produce a safety certificate for her oxygen tank despite

---

[8] Waites's complaint in this case does not assert the sex or age discrimination claims she included in her EEOC charge.

[9] Indeed, the Board does not re-address its untimeliness argument in its reply brief.

being repeatedly informed that such a certificate could not be obtained, and Waites contends that she was constructively discharged. Because these events occurred after December 17, 2007, Waites's discrimination and retaliation claims are not time-barred.

**Discrimination and Retaliation Under the ADA**

Turning first to Waites's claims for failure to accommodate and retaliation under the ADA, the court, for the purposes of summary judgment, does not disagree with the EEOC's conclusion that "Respondent was aware of the request for a reasonable accommodation and could have reasonably accommodated the Charging Party's request," and its separate conclusion that "[t]he evidence establishes that the Charging Party was constructively discharged inasmuch as she was forced to take retirement in order to maintain an income." The court notes, of course, that the EEOC's determinations are neither dispositive nor to be given deference. The court finds evidence to support the same conclusions.

The Eleventh Circuit applies the burden shifting framework of Title VII to ADA claims. *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1256 (11th Cir. 2007). Once a plaintiff has established a *prima facie* case, a defendant can offer a legitimate reason for the employment action. If the defendant offers such a reason, the plaintiff may rebut it by showing that the proffered reason was mere pretext. "In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that she

13

(1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [her] disability." *Greenberg v. BellSouth Telecomms.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)) (internal punctuation omitted). *See also* 42 U.S.C. § 12112(a).

Under the ADA, a disability is defined as "(a) a physical or mental impairment that substantially limits one or more life activities; (b) a record of such impairment; or (c) being regarded as being so impaired." 42 U.S.C. § 12102(1). Waites's list of physical impairments is substantial. She has provided evidence that she suffers from COPD, congestive heart failure, and pulmonary hypertension, and that she is limited in her walking, breathing, and bending. *See* 45 C.F.R. § 84.3(j)(2)(ii) ("Major life activities means functions such as caring for one's self, performing manual tasks, **walking**, seeing, hearing, speaking, **breathing**, learning, and working.") (emphases added). Waites also states that these conditions are permanent. See *Sutton v. Lader*, 185 F.3d 1203, 1208 (11th Cir. 1999) (in determining whether an individual is "substantially limited," considerations include the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact resulting from the impairment).[10] All of Waites's claimed illnesses

---

[10] Suggestive that these conditions are indeed permanent is the Social Security Administration's designation of Waites as

14

are corroborated by statements and diagnoses made by her physicians and rehabilitation therapists and sent on numerous occasions to the Board.  If Waites has not conclusively established that she qualifies as disabled under the ADA, she has certainly created a genuine dispute of material fact on this issue.[11]

Further, sufficient evidence exists for a jury to find that Waites was qualified to do her job, the second element of the *prima facie* case.  A qualified individual is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds."  42 U.S.C. § 12111(8).  The Board argues that Waites was not qualified to do her job because her oxygen use posed a direct threat to the safety of the students and herself.  *See Pinckney v. Potter*, 186 F. App'x 919, 925 (11th Cir. 2006) ("An individual is also not a 'qualified individual' if, by performing the duties of a given position, he would pose a 'direct threat' to himself.").  While Waites was initially concerned about the safety of her oxygen tank, she has submitted evidence that at the very least raises a fact question as

_____

disabled in August 2007.

[11] Alternatively, there is sufficient evidence for a jury to conclude that the Board regarded Waites as disabled under the ADA.  Chief of Staff Allen testified that she assumed that Waites had some kind of disability due to the kinds of accommodations she was requesting.  Moreover, the fact that the Board instructed Principal Lewis to put accommodations in place for Waites in August 2006, including giving her a first floor classroom and a closer parking space, indicates that the Board regarded her as disabled.

to whether the Board viewed Waites's oxygen equipment as a safety
risk.  Sometime in 2006, the Alabama State Department of Education
assured the Board that Waites's oxygen tank would not be unsafe.
Superintendent Mims' September 19, 2006 letter indicates that the
local oxygen provider had assured the Board that the tank would be
safe, barring exposure to open flame.  Waites's AFT representative
explained to the Board during the January 22, 2007 meeting and
again in his January 29, 2007 letter that "this type of equipment
[has] been safely installed in other schools and public and private
offices throughout the state."  These facts are sufficient for a
reasonable jury to determine that the Board knew it was safe for
Waites to return with her oxygen tank as of January 22, 2007.
Waites's fear of burning trash cans is evidence of the Board's
inability to reasonably accommodate her, but is not dispositive.
Indeed, Mitchell wrote, in the letter she handed to Waites on April
4, 2007, "you [have] been cleared to place your oxygen equipment on
site and return to work."  When asked what changed between January
of 2007 and March of 2007, which suddenly made it acceptable for
Waites to use her oxygen at school, Mitchell replied that she did
not know.[12]

_____

[12] The Board also argues that Waites was not qualified to do
her job because the Social Security Administration found in
August 2007, for purposes of awarding Waites benefits for
disability, that she became disabled on or around March 2006.
However, the Eleventh Circuit has held that an employee's
certification of total disability on a social security disability
application does not judicially estop the employee in all

With regard to the final element of the *prima facie* case, it is clear that "[a]n employer's failure to make reasonable accommodation for an otherwise qualified disabled employee constitutes discrimination under the ADA". *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1225-26 (11th Cir. 2005). Waites's claim of failure to accommodate is based on her allegation that the Board continued to insist that she produce a safety certificate for her oxygen tank before she could return to school, despite being repeatedly informed that such a certificate did not exist.[13] The Board argues that it had legitimate concerns about the safety of the oxygen tank and insists that it **did** eventually allow Waites to bring her oxygen tank to school, citing Mitchell's letter clearing Waites to return dated March 30, 2007. But the circumstances surrounding Mitchell's eleventh-hour letter are sufficient to suggest that the Board did not inform Waites that she could return until after she had announced her retirement, which, if true, would be unlawful under the ADA. Mitchell conceded in her deposition that she could not remember responding to any of Waites's AFT representative's letters, asking when Waites could return.

---

circumstances from arguing that she is a qualified individual with a disability under the ADA. *See Talavera v. School Bd. of Palm Beach County*, 129 F.3d 1214, 1220 (11th Cir. 1997).

[13] Although the Board, through Principal Lewis, did put certain accommodations in place for Waites in September 2006, Waites's claim is that the Board failed to accommodate her in another, more substantial way, i.e, allowing her to use her oxygen tank at school.

Mitchell says she informed Waites that she could return to work on March 12, 2007, but Waites testified that such a conversation never took place.  Mitchell also claims to have sent Waites a letter on March 30, 2007, clearing her to return to work, but Waites, in contrast, testified that she never saw the letter until **after** she had announced her intention to retire, and that Mitchell only handed her the letter on April 4, 2007, when she was merely in the office submitting retirement paperwork.  Mitchell claims that she was not aware that Waites had decided to retire in March 2007, but Mitchell is the same Board employee who is said to have encouraged Waites to retire when discussions about accommodations first began during the summer of 2006.  Material facts are in dispute as to whether the Board refused to allow Waites to return to work, citing a lack of a safety certificate from her oxygen provider, despite having knowledge that such a certificate could not be obtained, a finding that would make the Board liable under the ADA.  Therefore, the Board's summary judgment motion will be denied as to Waites's failure to accommodate claim under the ADA.

Waites also claims that she was constructively discharged because of her disability, which, if true, would be a case of ADA retaliation.  To establish a *prima facie* case of retaliation, Waites must show (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal link between the protected activity and the adverse

18

action.  *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d
1491, 1494 (11th Cir. 1989).  Waites's repeated requests for
accommodations for her disability constitute protected activity
under the ADA.  *See Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1194
(10th Cir. 2007).  Constructive discharge qualifies as an adverse
employment action as long as the employee can show that her
"working conditions were so difficult or unpleasant that a
reasonable person would have felt compelled to resign." *Griffin v.
GTE Fla., Inc.*, 182 F.3d 1279, 1283 (11th Cir. 1999).  The fact
that by March 2007, Waites was in danger of no longer being paid
and no longer receiving insurance because she had exhausted the
donated sick days, constitutes a working condition that a trier of
fact could conclude satisfies this standard.[14]  For the first time

---

[14] More specifically, Waites responded to questions about her
retaliation claim as follows:

> Q. Tell me how -- tell me what you believe the
> board has done or what evidence you have to
> support your contention that the board
> retaliated against you.
>
> A. They retaliated against me because they
> pushed me to the point where I couldn't go any
> further. I couldn't go back to work. They
> would not let me back to work in spite of all
> that I did. And responding to all the requests
> that they made, they still would not let me go
> back to work. So when they saw that they had
> pushed me to the point where I had exhausted
> everything, I had no other alternative but to
> try to save my insurance from having to be
> under specialists that I had to be under and
> still continue to function.

in its reply brief, the Board argues that unless the employer is given sufficient time to remedy the situation, a constructive discharge generally will not be found to have occurred.  *See Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).  However, taking the facts in the light most favorable to Waites, she announced her retirement nearly a month prior to Mitchell handing her the letter on April 4, 2007, ostensibly clearing Waites to return to school with her oxygen tank.  This, arguably, was too little too late.  Finally, the close temporal proximity of less than two months between Waites's requests for accommodations in January 2007 and her reasonable decision to retire in March 2007 because those requests were being ignored, is sufficient to create a causal nexus for purposes of establishing the final element of the *prima facie* case.  *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (finding seven weeks sufficient to establish the causation element).

----

Q. I'm not that familiar with how the state or the board's insurance works, so tell me about it. What do you mean you have to save your insurance?

A. If I didn't get a check, they could not cut the insurance out of my pay.

Q. Right. So by retiring, how did you save your insurance?

A. I was able to stay in the insurance program that was allocated that the state picks up.

The Board argues that it took no adverse employment action against Waites, but instead contends that Waites was told that she could return to work in March 2007 but then chose to retire. However, as discussed previously, this contention is disputed by Waites's version of the facts.[15]   The Board further argues that its continued insistence on Waites providing a safety certificate for her oxygen tank was motivated by reasonable concerns for the safety of the students at West End and Waites herself.   Yet, Waites has presented ample evidence for a jury to disbelieve this reason, and instead, to believe that the Board knew in January 2007 that Waites could not go without accommodations much longer.   Indeed, Mitchell has testified that she was aware that Waites was out of sick days at the January 22, 2007 meeting and discussed the issue with Waites's ATF representative.   It was necessary for Waites to have sick days in order to receive her full paycheck.   Additionally, Mitchell could give no reason as to why Waites was suddenly authorized to return in March 2007, after she announced her decision to retire, despite the fact that Waites never presented a safety certificate.   *See Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994) ("[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact

---

[15] The Board says that Mitchell cleared Waites to return during a conversation on March 12, 2007, and again in a letter sent on March 30, 2007, but Waites denies this, stating that Mitchell only handed her the letter **after** knowing that Waites was retiring.

to conclude that the defendant's articulated reasons for its decision are not believable."). In sum, Waites has submitted sufficient evidence for a jury to determine that the Board constructively discharged her due to her disability, and thus summary judgment is inappropriate on her retaliation claim under the ADA.

**Alabama Disability Discrimination Statute**

Waites also claims that the Board violated rights she possesses pursuant to the Alabama Disability Discrimination Statute, which declares it to be the policy for political subdivisions of the State of Alabama to employ disabled persons. Ala. Code § 21-7-8 provides:

> It is the policy of this state that the blind, the visually handicapped and the otherwise physically disabled shall be employed in the state service, the service of the political subdivisions of the state, in the public schools and in all other employment supported in whole or in part by public funds on the same terms and conditions as the able-bodied, unless it is shown that the particular disability prevents the performance of the work involved.

Despite its appearance as a mere policy statement, other courts have assumed, without deciding, that this statute provides a private right of action for damages against state entities arising from a failure to employ an otherwise qualified person because of a physical handicap. *See, e.g., Ayert v. Doyle*, 456 So. 2d 1096, 1098 (Ala. Civ. App. 1984); *Ethridge v. State of Alabama*,

22

847 F. Supp. 903, 908 (M.D. Ala. 1993). Little is known about what such a claim might entail in the way of *prima facie* elements, other than that the disabled person must presumably be able to show that her disability does not prevent "the performance of the work involved."

"One claiming a private right of action within a statutory scheme must show clear evidence of a legislative intent to impose civil liability for a violation of the statute." *Am. Auto. Ins. Co. v. McDonald*, 812 So. 2d 309, 311 (Ala. 2001). Waites has not submitted any evidence of legislative intent other than to quote Ala. Const. Art. I, § 13, which provides:

> That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay.

The Board argues that, even assuming for the purposes of argument that the statute creates a private right of action, the Board is an arm of the State of Alabama and is thus entitled to immunity from state law claims under Ala. Const. Art. I, § 14, which provides that "the State of Alabama shall never be made a defendant in any court of law or equity." *See Enterprise City Bd. of Edu. v. Miller*, 348 So. 2d 782, 784 (Ala. 1977) (a city board of education is an agency of the state and as such, is immune from suit in tort action). Waites does not respond to the Board's

23

immunity argument, and this court's independent research reveals no reason why the Board's argument is erroneous.  Accordingly, summary judgment will be granted on Waites's claim under the Alabama Disability Discrimination Statute.[16]

---

[16] Even if this court is wrong and the Board is not immune from suit, this court's conclusion that Waites is entitled to a jury trial on her discrimination and retaliation claims under the ADA affords Waites sufficient opportunity to obtain the relief and damages she seeks without resort to the Alabama statute.  The court in *Ethridge* explained why it did not need to decide in that case whether a private cause of action exists, as follows:

> The court's holding that Ethridge has a valid cause of action under the ADA affords him a much broader avenue by which to pursue his complaint.  The ADA and its regulations specifically proscribe various forms of employment discrimination against persons with disabilities.  The general policy set forth in § 21-7-8 to employ persons with disabilities does not, at this time, appear to impose any liability on defendants not addressed by the ADA.  Additionally, it appears that the ADA encompasses the types of remedies and damages that Ethridge seeks.  Should it become apparent to the court at a later date that § 21-7-8 would impose liability or afford remedies or damages not covered by the ADA, this court may then need to decide whether that section creates a private cause of action.

847 F. Supp. at 908.  The same is true in this case.  Waites's amended complaint seeks the same relief for alleged violations of the Alabama Disability Discrimination Statute—compensatory damages, injunctive relief, and attorneys' fees, interest, and costs—that it seeks pursuant to the ADA.  The ADA thus encompasses the types of remedies and damages that Waites seeks, and the Alabama statute does not on its face appear to impose any additional liability on the Board not addressed by the ADA.

**Conclusion**

For the foregoing reasons, the Board's motion for summary judgment will be denied in part and granted in part. An order effectuating this opinion will be entered.

DONE this 27th day of January, 2012.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE